All right. We'll hear arguments in Thomas & Betts v. Richards Manufacturing. Good morning, Your Honors. My name is Kevin McAuley of Gibbons, D.C. appearing before Helen & Thomas & Betts Corporation. Both parties were probably, from time to time, referred to as Elastomo, which is the name of the division. I couldn't hear. I'm sorry. I'm a little hoarse this morning. Both parties were probably referred to Thomas & Betts as Elastomo from time to time. We figured that out, but I thought we'd use the captions. Who's responsible for 29,000-plus pages? Both of you? Nobody takes responsibility, right? All right. Your Honor, it's a cliche, but a true one, that where you come out of a question sometimes depends where you go in it. And when we're picking the law that applies to a case, it's very important at the outset to identify what kind of case it is and what kind of case it's not. What the case is not is a case of a negative employment covenant restricting an employee's ability to be or be employed in an industry. What it is is a case of a high-level employee's taking of very important, crown-jewel information from his former employer and bringing it to a defense. That is a breach of the duty of loyalty. The law that applies to that is different from the law that applies to a case of a negative employment covenant. And that's the fundamental error that I wish to talk about. Before you get there, let me see if I can hone it in even further. You challenge, as I see it, only the formulation of New Jersey's protectability standard as to confidential information, not as to trade secrets. Have you relinquished your claims as to the alleged trade secrets? Your Honor, let me answer it this way. In the course of narrowing the issues for appeal, the trade secret one seems superfluous. That is, it is a higher burden than we need to be. Yes, it is a higher burden than we need to be. We only need to show that it's protectable confidential information. So we're only going forward on the 92 items of confidential information. That is right, Your Honor. Let me ask a second question. And then I will let you… I always say this and then I just lie. I can't help myself. I'm happy to answer whatever you'd like to ask. I was going to say I would then not ask any questions for about five minutes. You're not seriously alleging a Roman house process claim here, are you? Sure. That is, let's take the closet documents. That is 600 pages. I'm saying you're not seriously alleging it. It's not in the pretrial order. It's not in the answers to interrogatories. There are some allusions to it in your blue brief and your yellow brief. But I don't see it alleged as a Roman house process combination claim. Not in those precise words, Your Honor, but again and again. That's what I'm asking. Don't dance around. Is this alleged as a Roman house process claim? And if so, where was that argued to the district court? I'm trying to get this focused. And then we'll go into where you want to be, which is the appropriate law.  Which are not part of that enormous appendix. The pretrial order certainly does state that. Where does it allege a process claim as opposed to 92 individual items and why each one is there? Sure. Because we've looked. Are you looking at the pretrial order? Is that what you're looking at? Sure. For example, at appendix 18875, it says, and I'll quote it for you, that Richard amassed a vast array of proprietary information to begin a knockoff manufacturing line. In other words, they took all of this information. What are you reading from? The pretrial order at 18875 of the appendix. Also the pretrial order at 18939. And that's your Roman House process claim? Sure. That he took everything he gathered and used it to create a new process at a new firm. Why did he have to go through 92 different items, Judge Chesler? Judge Chesler asked us to do so. He asked us to break it down, tell me what each secret was, and what I am arguing to you here is that that was essentially misguided. Where did you tell him that he's misguided in doing so as opposed to just going along and doing it? And, of course, it started, I think, when he set the standard in one of the earlier opinions. Once he set the standard as he did, it became appropriate, perhaps in everyone's view, to identify these items item by item as opposed to one process. Yes, I think that's exactly right, Honor, and that once he, in the first opinion, the 2005 opinion, where he says, look, Thomas and Betts argue that the Lamorte fiduciary breach or breach of loyalty standard applies, but Richards argues that the Solari standard applies, and he makes this test, this four-part test, that essentially is a kind of elaboration of the Solari line. Yes, it became important to talk about each item as if it had to be a secret by itself. Well, you argue in your briefs that this is a process claim, although we had a lot of trouble finding in the record reference to a similar argument before Judge Chastler, and it's one thing to identify the process as confidential information. Most of your arguments are based on that proposition, but to identify each of the 92 separate elements as confidential and to prove it, it took you off track at the get-go, and we don't see anything in the record where you forcefully brought that to the attention of Judge Chastler.  In your whole collection, the closet documents are a very good indication of that. The whole collection was essentially a transfer of technology from one firm to another. We argue that in our briefs. The pretrial order does say taking all of this stuff, allow them to create a manufacturing process, but I agree with you. It is sure buried in there. I mean, I read that pretrial order from beginning to end, and I mean, a process claim is a process claim. It's not 92 items and then 10 trade secrets. But I will say this, and let me say this in your defense, not that you need me to defend you. You came into the, I think you entered your appearance in March of 2007. You're stuck with a record you've got here. Well, the appellate lawyers, like the appellate judges, have to think the record is not mine. I think, this is just my own supposition, that if, and let me just say this. I think we would all agree because Judge Du Bois is a district court judge. Judge Smith and I were. Judge Chesler worked so hard in this case. He deserves an awful lot of credit. Whether we find that he was right or he was wrong, his efforts here were quite incredible. I just want to say that. Who can disagree with you? Perhaps one can argue that he got a little off the trolley in setting the standard because he looked at one or both employment agreements. The 1996 agreement and the 1978 agreement. And he didn't find which, if either, necessarily would control. But what he did do is apply the non-compete case law because those were non-compete agreements. You say at one point in your brief it wasn't a non-compete agreement, the 1996. I don't understand that. These both had non-compete, the 1996, let's talk about that, had a non-compete agreement. And the non-compete case law, which is the way you wanted to start off this argument, is different from the confidentiality case law. But everybody seemed to agree that the two employment agreements, or one of them, are what one looks at to set the standard. And nobody talked about the release, which specifically excluded, rescinded, vitiated those two agreements. If you look simply at the release, you don't have any non-compete. That's right, and that's number one. And number two, just as a matter of fact, nobody ever claimed, or tried to claim, that Mr. Leslie was not allowed to work in the industry, or wasn't allowed to work at Richards, or had to stay out of the territory for a year, all those things that are in non-compete. But nobody was also telling Judge Chesler not to look at those two employment agreements. And because they included non-compete clauses, which have to be very tight. The law is pretty strict when you're coming to non-compete for reasons you all know very well, as opposed to a somewhat looser law on the confidentiality group. Nobody told him, wait a minute, look at the release. Yes, well, the release... Don't apply LeMoyne-Burns, because we had a release here, and the release controls. And all you've got left after the release is a gap like this, a non-contractual agreement not to... On that issue, there was a stipulation, wasn't there? I believe so. And also, it's in the summary judgment record, and I realize the perils of saying that in a record this size, but it is certainly in there that Mr. Borgstrom said, you know, go in peace, work where you like, but remember, you still have your confidentiality. Well, that's what the letter says. I'm referring to the letter of December 17, 1998, from Borgstrom. It says, Thomas and Betts hereby releases you, Mr. Lusey, from any previous employment restrictions which you have signed. Then he says, notwithstanding the above, it is understood that you are not permitted to share or release information proprietary to Thomas and Betts' elastomode. So the agreements are history at that point, but the final pretrial order contains a stipulation to the contrary. It says, prior to resigning from elastomode, Lusey met with Borgstrom. I'm paraphrasing. T&B released Lusey from only the non-compete restriction within his non-competition inventory and secrecy agreement. So you put the agreements that Judge Chesler had trouble with back into the case by agreement. Yes, because I think that the way to reconcile those two is that the import of the letter is that he's being released from the restriction on his employment, but not the restriction on what information. But the agreements contain a very broad definition of confidential documents. They refer specifically to any other documents of Thomas and Betts. The agreement released him from any previous employment restrictions which you have signed. So that's the end of the employment agreements. Well, employment restrictions, right, but that agreement contained other things besides employment restrictions. It contained informational restrictions. All right. And I think that's what everyone was driving at. All right. Will you close? So anyway, my time is already running short, but let me just say that the fundamental error here is an eerie error, that it's a misapplication of state law, and that the standard that should apply was the Lamarck standard, which is? Misapplication or inaccurate prediction. Well, you know, prediction is an unfortunate term that's used in the eerie law. You don't have to be a seer usually. Usually there's a case that will tell you off. And this is one of those cases. Yeah, Lamarck Burns. And Lamarck Burns is by far the most recent, most authoritative, and most applicable case, and the line of which it is applied tells you exactly what the standard is. And it is a standard of loyalty. That is, if this employee has breached his duty of loyalty by helping a competitor, that is the actual conduct, and the nature of the protected information is information that you have by virtue of your employment that is understood to be used in the course of your employment. Now, if we adopt or if we say the appropriate standard here for confidential information was based on Lamarck Burns, can a court find Richards liable for misappropriation of confidential information, not merely Luszi?  One of them would be there's a tortious interference. But that was dismissed earlier, and I don't see that as before. Oh, sorry. But yes, I think they could by their participation. But there's no agency relationship between Richards and P&B. Oh, of course not. That's right. But there is between – but he is acting on behalf of Richards at least after he goes to work for Richards. And that is, Mr. Luszi is acting on behalf of Richards after he goes to work for Richards, and that breach continues and the consequences of that breach continue. There is also facts from which you can find that even before he had resigned from Thomson that he was acting after Richards. He was downloading documents, bringing them to Mr. Beer. Documents, by the way, that he did not even really have contact with in his usual job duties. I mean, he had to get instructions for how to get into his computers to get these documents. Two days before his interview with Mr. Beer. So yes, I think that you could find, or a pipeline driver could find, that Richards was an active participant in this and that it should be a liability to that. In the short time, I guess I should just emphasize that this is a case of the main product of the last monopoly. There's a lot at stake here. They had an unchallenged market dominance in this product, and Richards was unable to get into that market unless he was filled with it. They had Mr. Leslie on board to help him in that. The last case we had, the attorney for the appellant was postulating this lengthy opinion he would have us write on all of the issues he would like to see before us. This case, at bottom, it seems to me, is a simple case in the sense that if we start from the back of it, one of the later points raised in your brief, whether or not Judge Chesler incorrectly excluded the bulk of the expert's testimony, and we find that he did, then it's not a huge leap to say that the bottom line issue before us was summary judgment properly granted. It would likely be answered the other way. Correct? I think that is correct, Your Honor, but I think... Even under just the Rule 56 standard. Sure, even if you spot them, the applicable rule of law, I think you would have to find the summary judgment. But you have to really deal with the Lamort-Burns, I think, because Judge Chesler would need guidance if this were to go back. I mean, 40-some-odd items were excluded because they were not generally known in the industry. Well, that would be wrong under the Lamort-Burns standard. Right, because as long as you're helping a competitor, that issue goes by the rules of the Lamort-Burns. So I think that the Court should state the proper rule of law in the course of, also, the person's summary judgment, and should also remand saying that, look, under the proper standard, summary judgment can't stand, this has to go to trial. I don't think we should be remanded for another round of summary judgment motions, which are getting pointless at this stage. I see my time is well past, so thank you very much. We haven't stopped you. Are there any questions you want to ask? No, thank you. Your Honor, may it please the Court. The first point I'd like to go to, Your Honor, which you asked about, which was the exclusion of Mr. Woolworth and the effect it would have on the case. In fact, it would have no effect on the case, because on every essential element that Judge Chesler made a detailed factual finding that it was a trade secret for every item of confidential information, in addition to the not generally known standard. But not under Lamort-Burns. I'm suggesting, Your Honor, that even if you removed the Lamort-Burns not generally known test, there was no element, there was no item of confidential information, and there was no trade secret. Well, I think that he could have testified as to the efforts to keep information confidential, correct? That was part of the proper expert testimony. It has nothing to do with what you're talking about. Correct, Your Honor, except that he could not have testified,  worked on the floor in order to sign confidentiality agreements, an item that the judge relied upon in finding most of the items of confidential information, not to have met the third element of this test, which is the circumstances under which each met. He could not have testified as to whether the items were particularly defined. He could not have testified as to whether the items were a moving target. These are all individual reasons. He could have testified to one heck of a lot. Actually, Your Honor, going back and taking that issue in front of me. For purposes of summary judgment, that's the thing. We have to keep our eye on this ball. This was a grant of summary judgment. Agreed. And in essence, what the judge found was that the T&B had failed to come forward with evidence sufficient to rebut the evidence that was brought forward by Richards by its workers in the industry that these items were generally known that they were used. Not that they were generally known, but they were used by other people in other companies. That argument is predicated on the approach that Judge Chesler ultimately took, and that is each of the 92 items had to be identified and established as confidential individually and not as part of a process. No, no, he didn't take that standard. He took the standard of how to identify them specifically. He cited the SI handling case in the early summary judgment motion to explain that this court looks at each of these items as separate trade secrets in order to be able to fashion a remedy at the end of the case. So he said, if you want to preserve it, you need to put it into the pretrial order. You need to have given me an interrogatory answer that explains your claim. In this case, as Judge Barry mentioned earlier, there is nowhere in the record that this aggregation claim or this process claim as it were is identified. So you're saying we cannot treat this as a process claim? Well, you can't. You cannot treat it as a process claim. And more importantly, because there's no factual record to treat it as a process claim. But more importantly, had it been a process claim, it wouldn't have been an item of confidential information. It would be a trade secret, and you would go to the default rules of trade secret law. In other words, the argument doesn't make any sense. If it's a series of steps or a recipe or a group of steps that are interrelated to create something new and different, which is what you have in Roman Haas, then in that case, it's a trade secret. You don't need to look at this new body of law that was formulated in the case. What brought this up was that T&B came forward after the close of back discovery in an interrogatory answer and said, there are 30-something items of confidential information that we're asserting were taken. Do not rise to the level of a trade secret. Judge Chesler said in the pre-trial order, articulate every trade secret, articulate every item of confidential information, and this is what the record will be in this case. It wasn't the judge's fault. Defendants, pardon me, plaintiff, failed to come forward with any articulation of a claim that it was an accumulation or anything like that in the case or a process, and as I suggested, it was a process. You'd move it up to the trade secret analysis. But I would point out, Your Honor, that Judge Chesler also did not necessarily go off the rail. In the way this was presented by T&B, they took these 90 similarities that were found by Mr. Woolworth when he looked at these items and thought they were similar, and what he did was he then looked at them and he said, how do I analyze this? He found there were three types of information in New Jersey that we recognize. We recognize trade secrets. We recognize general information which can't be protected, and we look at this middle category, which is this confidential information. It doesn't rise to the level of a trade secret. You see the stipulation made by T&B that they say these items didn't rise to the level of a trade secret. How do I treat them? He then went and looked at this well-documented authority in New Jersey, the Solari-Wittmeyer test, which deals with post- Those are restrictive covenant cases. Oh, I don't agree with you, Your Honor. In that case, they discussed the Raven case in getting to their point about post-employment restrictions. New Jersey has a strong policy that you have to consider the interests of the employer, the interests of the employee. That's what you have in the employment agreements. Well, I agree with you, Your Honor, but how do you, as I would point to your question, which I think is on the money, when you said, how do you get to Richards? In order to get to Richards, you have to find that there was a misappropriation of confidential information or a trade secret or something. Maybe the misappropriation was just this simple. Maybe the misappropriation was one single item, the closet documents. Your Honor, would you argue that if you take a black office wall or pencils, that was a misappropriation claim? You have to look at the substance of the information. If you took one item, you shouldn't have taken it. One item, but, Your Honor, the item is one item of what? Confidential information. Yeah. Okay, how do you define it? It's got to be something that can't be general information. There were documents. That's why we're right back to the standard that Judge Chesler created. I think that's the word that TMB uses. And, by the way, what I'm suggesting is, without getting into too many policy decisions, that, in fact, the standard he suggests from the cases, from Ingersoll Rand and from LaMortie is actually a fair representation of what those cases say. And, by the way, Your Honor, I would suggest to you that under LaMortie, the court did find in LaMortie that this information did rise to the level of a trade secret. It then went off and discussed the standard and took this one sentence where it says, based on the relationship of the parties and the fact that employer-employee relationship and that it was done in the part of the business, we find it. But, nonetheless, this is true. You say in your brief that LaMorte Burns says that the information at issue must not generally be known in the industry and that this was the basis on which Judge Chesler dismissed at least 45 of the items alleged to be confidential. But LaMorte Burns doesn't say that at all. LaMorte Burns says the inquiry that what we have to ask about is whether the employer had an interest in keeping that information and the understanding of the significance of that information from its competitors. That's a much different thing than what you say LaMorte Burns said is required. LaMorte Burns refers to the fact that this information was not known by its competitors. I believe that it discusses the fact that it couldn't be known as a collection of information. These insurance files and the information in it could not have been known collectively to give a competitor an advantage. And, therefore, if you're talking about LaMorte Burns, you still have this element of the fact that the information was unique and could not be discovered without unfair means. So, therefore, you still have to look at the nature of the... The inquiry always starts with the nature of the information to suggest that the mere employment of someone that's going to go into a competitive endeavor doesn't have an effect on that employee when he leaves the company if he can't use information. It's not proprietary or confidential. And it's generally known in the industry is a restraint on employment. And that gets you back to Solari-Whitmire. Does it not? This is not a Solari-Whitmire case in my judgment. Well, I think... This is a duty of loyalty case. This is a confidential information case. But, Your Honor... Isn't it? So, then, let's... How do you prove that the information is confidential? You don't do it in summary judgment. One says it is, and one says it isn't. Yes, you do. You bring forward witnesses that say that this information is not generally known. How can information... Not generally known, though. Not generally known in the industry is not an element of a Lamorte Burns confidential information claim. Oh, I think that in... The only word generally that appears with reference to Lamorte Burns is whether the information was not generally available to the public. And that's different. Well, not generally available to the public. If you were to change Judge Chesler's standard to not generally available to the public, you still would have the same result in this case. Because defendants came forward with no knowledge, no information or no witness to talk about in the industry that this wasn't known information. You're back to industry again. Well, I am. Because I think you have to look at this in context. I think that not to look at it in context is to take Lamorte Burns so far over... Where did the district judge in this record... He made a number of findings of fact, as I see it. Where did he view any inference in the light most favorable to the non-moving party? Well, the fact is that he took each of these items one by one. He went into the documents. He tried to find information that they were arguing. When he said it was a moving target, I guess there's no inference given other than he couldn't figure out what it was. When he said it wasn't particular, he couldn't figure out what they were claiming. But what he did was he looked at each of these items based on the testimony of the witnesses. I would grant you, Your Honor, that if there's no evidence, if there's no evidence that hundreds of employees signed a confidentiality agreement, what inference can he give to you? Let's just play a little bit with what the evidence... There were 35 or some documents that were marked confidential, right? Let's just put it very simply. They say they're confidential. You say they're not. That's a disputed fact, isn't it? No, because the record is... It's not the inference? No. Don't you... It's a disputed fact, even without drawing an inference. Your Honor, may I suggest the record is a little different than what you suggested? Well, were there, I think it was 35 items marked confidential found in the closet? Yes or no? There were 35 documents... You have to yes or a no question. Yes. Okay. Yes, with one caveat, which is two were marked confidential, the rest were marked proprietary information of the company. But having said that, that's a technical point. Let me just point out, next the judge said, okay, now show me the information that's in the documents that translates into an item that was misappropriated by Richards. Fair? I don't know it's fair in some regions. Okay, I'm sorry. That's the record. He now says, come forward and show how the information in the documents became part of the Richards process. Then when he traces the information and he looks at it, he finds only two documents... You don't mean to say the Richards process, do you? Well, I mean the... How did the two documents that were used, that were T&B documents, translate into a misappropriation by Richards of confidential information? And so he traces the information in the documents to find out if in fact they were used by Richards and whether or not they're confidential information. The only thing, whether they're used, now you're going to misappropriation claim. All he really dealt with here at bottom is whether 92 plus 10 were protectable, correct? Yes. That's it. How did he inform himself which 92 to look at? The expert, the plaintiff's expert. He identifies the similarities between the products and the processes. And then says, now the judge says, okay, now that I've got it, I understand what we're talking about, with respect to each item, let me look at the quality of the information in the documents and find out... Yeah, but is that a decision on summary judgment? Well, it is in the beginning. They say it's important. They say it's critical. They say he stole this stuff, all bad motives. And he gave fear the oil-resistant formula when he interviewed with him, the president of Richards. What about the inference adverse to you? There's no testimony to that, Your Honor. Beer said so. There is no record. Beer said it didn't happen. Beer said it did happen. Beer said he showed me the formula. I'm sorry, Your Honor. Beer said that after he came to the company, he showed me the formula, not during the interview. He brought the formula to the interview. That doesn't matter. It doesn't matter. There's no evidence of that. What about the fact that, for the first time, Richards came up with an interchangeable product shortly after Luzzi arrived, whereas before they had a, quote, comparable end-of-quote product but not interchangeable such that Con Ed would use it? That inference was certainly not drawn in favor of... Well, first of all, because of all the trial and error evidence that was submitted to the judge, over a year that it took Richards almost 14 or 15 months to come up with his first prototype product, because of all the efforts it had to make... It never had a prototype before. It took 15 months to go into competition to get the exclusive contract with Con Ed. That took two years. You say two years. They say 15 months. Whatever. Isn't that a genuine... But again, again, that evidence was clearly... The judge had that evidence before him. All this is based on fully-ventilated records. Isn't there a surreptitious inference that should have been drawn on a motion for summary judgment? Only with respect to actual information that was transferred. Again, they argue marketplace considerations. Here, you had a look at the information. You had a look at the items that were alleged to be misappropriated. And at the end of the day, there was nothing in these items. They were empty. They were empty items of information that were well-known in the trade. Why would you have to go to trial? The oil-resistant formula was well-known in the trade. The oil... Excuse me, Your Honor. The issue, again, was not the oil-resistant formula. It was the 60-40... That was one of the items. Well, that's your argument, you see. That's your argument. No, that's their argument. That was their trial order. I'm sorry. I didn't mean to interrupt you, Your Honor. I apologize for that. There's a dispute here as to what was or... They didn't argue. They withdrew that rags were confidential, right? One would expect that. Huh? One would expect that. One would expect that. Yes. That's getting to your Rule 11 motion, which is a whole other thing. If we were to reverse, would you agree your cross-appeal is moot? Absolutely. Your Honor, but... Well, actually, I take it back. It would be... That was too easy. It was too easy. I'm sorry, Your Honor. I was thinking about something else. No, no. I'll tell you this. You don't have to take it back. Your Honor, Your Honor, I think the dropping of those 13 items, when they were all cumulative to the first group of items that were cited, was not something that was beyond the line. You know what? D&D could have moved this case to appeal a lot sooner and not lost any rights and created a final judgment under this court's Brazilian case. Well, that's a latches one. You lost that one. You lost that one before, Judge. I'm making an argument about the Rule 11. You got the win of your life here from Judge Chesler. I couldn't believe you came in with a motion under Rule 11 and all this other stuff. I mean, it brought me back to the good old days when I was on the district court, had a very, very contentious trial, and the jury came in after two months. I said, finally, it's over. And they come back with a Rule 11. I just wanted to say, go away. But you bring this motion, and then you inundate it with more stuff. It would have been gracious just to go away with a win like this. It would be moved, wouldn't it? I hear you. Well, even forget the graciousness for the moment. But, my gosh, if the summary judgment filers of the world, many defense lawyers, would be very upset with you because if they don't stipulate to something, and on summary judgment there's an adverse ruling, they'd be subject to Rule 11. Well, when you can't. I'm talking about the response. The question I have on the Brazilian, which I am troubled by, is that it does seem to me that when you have the same claims, you've bifurcated it, you've taken some of the claims, and the plaintiff readily admits that it cannot, there's no theory under which you can win based on the legal standard, what is served by moving forward? You do get a final judgment because if the court reversed and all they had done is stipulate that they can't under the judge's standard win, we could have made a summary list of all the items. They would have said we can't win under it. We still would have gotten to appeal, and the record was cumulative. This is the case where I believe the Third Circuit does believe you can make a final stipulation, and I think that the bar is served by that, and so is the Third Circuit. Your Honor, this has been a very expensive case, and I understand that the case got started because of the inference, because of the documents that we brought forward in discovery and showed that they were taken by Mr. Luzzi. I understand that, and that's why we had to go through all this effort to find workers in the industry that used all these items to show there was nothing to the case. There was nothing to the claim. Having said that, you can look at inferences, but the fact is what Judge Chesler said was I've seen the testimony in this industry. I've looked at these witnesses, the guys who have the dirt under their fingernails, who mold these parts. They tell me there's nothing new here. Where do I go? Let's find out if there's something protectable. That I think Judge Chesler served the courts, the system, the parties, because he made this initial determination that no jury could find that they could move forward on. It seems to me that this case got away from everyone because there was some understanding, right or wrong, that the non-compete cases would apply here. That's what I think happened. I think, Your Honor, that it goes beyond that. I think that when they argued the trade secret claims, the T&P was trying to assert that Richard's blood should be enjoined for misappropriation of their trade secrets. When they identified these items, they recognized that they were like individual steps and they weren't in process, as you noted earlier. Like in the Roman Haas case. And as a result of it, they identified these items, 92 of them, and the court had to deal with them. And the court then went out and said, okay, let me come up with a standard. If they're not protectable, if they're not confidential, if they're general information, how can there be a claim here? So what he did was he looked at the documents. I mean, a judge, rather than sitting there and chiding Judge Chesler, I think what he did here was he took a mass of information and tried to break it down so that it could be manageable to the court. And he wanted them to define it with sufficient particularity and found out that they didn't. But that came from the non-compete cases again, not from Lamorte Burns. Lamorte Burns, it was as particular as it could be. It was insurance files. Just because it didn't use the words particular, how can a district court in the first instance ever deal with a record that's not particular? What is the judge supposed to do? Try to guess what the claim is? Well, what is the claim? It's a misappropriation claim. Right. Supposing one item is misappropriated. One item of confidential information has been misappropriated. Don't they win on a misappropriation claim? Well, at the end of the day, if an item of confidential information, something that's not generally known, yes. But in this case, the judge said, let's look at whether this is protectable information. Does it not concern the court that the information was known, that we brought in guys with all of these connectors from three different companies, four different companies who know the industry, and they all said these were known process steps. These were known trade secrets. That's why I go back to what I suggested earlier. Maybe the thing to do is to look at what, even without dealing with whether what was before Judge Chesler should have warranted a denial of summary judgment or a grant of summary judgment. If the expert's testimony was wrongly excluded, was there sufficient information warranting a denial of summary judgment? That's the easier question. And I would suggest that on appeal, defendants have never argued one finding, one holding, one ruling by Judge Chesler with respect to any of those items, that would have been changed or modified by reason of the admission of Mr. Walden. Not one. I think there is, well... Not one. And I... The efforts, the expert would have testified, just for lack of, I don't want to go through his testimony, would have testified to their efforts to keep information confidential, them, they, TV. He would have testified to their efforts. Their efforts to keep information confidential. Even though he wasn't... You say they didn't keep it confidential, he would say they did. In his Dowderall hearing, he indicated that he was not an expert and he didn't have experience in terms of general security in the underground electrical connector... See, but that's, now you're going right back into our case, the one we decided last year, 2008. You don't have to have the experience in the subset, in the narrow subset, as long as you have the experience in the larger area. But anyway. But again, my point is, he had no experience with respect to... When it comes to connector technology, underground electrical connector technology, he had no general experience. And the judge did say that he allowed him to testify as to his observations in the industry that he actually had. So he didn't exclude the experts. Any of them. What he did was, he limited what they could testify to. And they, he had no ability to offer an opinion about general security efforts. Well, we've let you go way over... I'm sorry. Thank you. Thank you very much. Thank you. Rebuttal? I'm not asking one more question. I'm going to be good. Your Honor, in that spirit, perhaps I'll sit down. Well, we have two others who may want to ask you a question. Any further questions? Well, the major question is, how did the process claim get out of the case at the early stages and reenter the case in your appellate brief? Well, I think I gave some insights to the pre-trial order where we talked about the whole lump of information that was taken and how it permitted them to produce the product. And again, the process claim, I think, was vigorously argued at the first summary judgment. We couldn't find it where it was vigorously, where a Roman Haas process claim was vigorously argued. We were looking for it. Well, we said he took the whole thing. We cited Roman Haas. What is the process, anyway? Well, process isn't really the terminology. See, that's the whole point. No, it's the method of manufacturing. It's the cookbook. It's the standard procedures. It's the recipe. You can take this stuff. What's the recipe? The recipe would take me all of that probably to explain, even if I could. But it's the product. It's the standard operating procedures. It's the chemical formulas. It's the temperatures and the times. So absent one of those ingredients, the recipe flops, right? You've got to put it all together to have a process that works, as evidenced by the fact that B&E or Alessio. Every one of those 92 ingredients were not part of the process. Well, we dropped some of them. But they weren't part of the process. No, some of it was business information. That's right.  Rags we dropped. Forget the rags. But, you know, I mean, highly useful business information, cost centers, fixed and variable costs. Remember, this is manufacturing. Keeping costs down is the name of the game. That's the difference between success and failure. And all of these efficiencies that they worked into the process were simply transferred. If Your Honor likes that, I would be happy to send you a letter with some record sites. But you've probably seen enough. Does anybody want some more paper? You want some more paper? Would you laugh at me if I said I hate to be a father? All right. Thank you, Your Honor. Thank you. The case is a difficult case. I don't know why it's become so difficult. Well argued. We'll take it under advisement. Thank you. Adjourn the Court, please. Thank you, Your Honor. This Court stands adjourned until Tuesday, July 7, at 10 a.m. The Court is adjourned. Take care. Thank you.  Thank you.